And our last case for argument, Alvaredo v. Colvin, Ms. Hanson. Good morning. Pleased to report. My name is Ellen Hanson and I started representing Mr. Alvaredo in the first U.S. District Court case that was remanded. He has been disabled since birth according to a finding back in, he was born in 1967 and a decision in 1993. And this was a Zebley decision by the U.S. Supreme Court where all minor children cases that were before 1984 were to be reviewed by every state agency. An interesting thing happened this week on Monday, March 26th. The Social Security Administration changed their Social Security rule on credibility. On what? Credibility. I presented the old rule on page 32 of my brief and it is 96-7P and the importance of that is that on the credibility issue, in my brief I say, look at the medical impairment and look at the symptoms and therefore when you judge the credibility of all the people that we presented in the case, you look at the medical impairment and you look at the symptoms. Now, what the Social Security did was... Counsel, I don't recall receiving a Rule 28J letter, so you have the advantage of us with respect to these rules. Yeah, I just learned about it on Monday. You have to file a Rule 28J letter if necessary on the day of argument our rule says. Okay. Or you can't discuss them. Okay, then I won't. But what you are saying raises the question, does this change of rule apply retroactively? Did the Commissioner declare a retroactive application? It declared immediate. No, that's different from retroactive. No. The Supreme Court held in the Georgetown University case that with unimaginably rare exceptions, changes in administrative rules do not apply retroactively. I'm just wondering whether this one declared retroactive change. No, it didn't. Okay, then I think you ought to move on with your argument. I will say that I argued it properly under the new rule. Okay. The other thing that happened on this case was that I found from the Commissioner's brief that they were arguing POMS. The judge did not argue POMS, and I could have said, therefore, this would be a chenery argument. I didn't argue that because it gave me the opportunity to find the correct POMS. The correct POMS talks about mental limitations. The correct POMS for a mental... Well, now he drives, right? Pardon? He drives a car. Yes. Does he have a license? Probably. Yes. I hope so. Okay, so he drives, and he worked in a flower shop. So the very modest jobs like a cleaner that the vocational expert listed, aren't those jobs within his capacity to do? Well, first of all, you used the word works. The judge did not find he had substantial gainful activity. The judge found that what he had was that he had some work skills, but the judge did not tell us what the work skills were. Wait, I don't understand you. The judge... I mean, the way this works, the judge explains to the vocational expert the physical or mental limitations of the applicant, and then the vocational expert identifies some jobs which he thinks a person with these limitations can do, and then tries to estimate how many such jobs there are. Well, that's apparently a farce. So, what is wrong with that analysis? What is wrong with the analysis is that the learning disability requires him to meet accommodations and structure, and that the acknowledgement that he works slow, his pace is slow. Well, when he was working in the flower shop, what kind of accommodation did he receive? He was working for his mother, and his mother said, I took him to work because I did not want him sitting at home alone. And so, he had really no expectations of any work standard. He did have certain things he did that were driving to known places at known times, but if he was to drive to any other place, he would get lost. Yes, but what about in the flower shop? What did he do in the flower shop? Nothing. Nothing? He didn't work? He didn't work. I mean, they tried, they would have him answer the phone, but the phone messages were mixed up, and it would anger the other people. Well, the administrative law judge said, the claimant helped out at the flower shop, including making deliveries and picking up flowers from wholesalers, and also driving his mother to and from work. So, are you saying that's false? He didn't help out? He didn't make deliveries? He didn't pick up flowers from wholesalers? He made deliveries with her. He did go to the wholesalers because it was the same place every day. I think there was one exception on her not being there, was there was a gas station that was close by, and even he says one time it took him forever to get there because he made the wrong turns. According to him, according to his testimony, he watched television, played computer games, visited political websites, YouTube, bought and sold items on eBay. These are several of these things I can't do. I probably shouldn't be a judge, right? I don't play computer games. I don't buy and sell. I've never bought and sold items on eBay. He had help. We'll be establishing an eBay training program for you. He had help when he did this. Makes simple meals, does his own laundry, puts away the dishes. That's the sort of thing I do also. Helped with a friend's congressional campaign? I don't know. He went to college for the learning disabled. That was considered back in 1993. It's been considered all along, and it was just like this judge had just discovered this and wanted to make a deal about it where he had tutors, special help, and the most important school that he went to was Landmark, which specializes in it, and they couldn't help him. He didn't complete any of these courses. Supposedly he completed an associate's degree that would have been in a college down in Normal, Illinois. I think there he had tutors and help and everything he did after that. What was that associate's degree in? I don't know. That's why it didn't help him with his continuing college. But anyway, all the college was accepted. I think my time is up. I think his college time was known previously. I think the adjudicators at the state agency understood that there are schools for the learning disabled, and these learning disabled programs could not change his pace. They could not change his need for accommodations. They could not change his need for structure. That continues into his adulthood. I think my time is up. Okay, thank you very much, Ms. Hanson. Mr. Truitt? May it please the Court, I'm Eric Truitt on behalf of the Commissioner. To answer Judge Williams' questions, it appears that his associate's degree was in Arts and Humanities. Could you speak up a little? Yes, his associate's degree was in Arts and Humanities, and he was a few credits short of a bachelor's degree. Apparently, it was a research methods and statistics class that was quite difficult for him to complete. And as to Judge Easterbrook's question, the new ruling is not retroactive, so I don't think it applies to this case. Just as a matter of curiosity, though, I hope one or the other lawyers will file a Rule 28J letter with that information. Yes, I will do that, Your Honor. Thank you. This case has a large record, and it's obviously a very long ALJ decision, but it comes down to a relatively simple formulation. Mr. Alvarado, or Eric, was found disabled because his impairments medically equaled the listing. Under the Zebley case, which Ms. Hanson discussed, an impairment that meets or equals a listing is presumed to prevent all work, not just substantial gainful activity, but any gainful activity whatsoever. So if there's evidence after 1999 that he actually was engaging in some work, that is evidence of medical improvement. Previously, the impairment equaled the listing, and then there was evidence that he was working in the flower shop after 1999. That is evidence of medical improvement. But it seems that he needed very, very close supervision to do that. And so the question is, outside of his mother's flower shop, would he be able to perform certain jobs like cleaning and some of the things that the ALJ said he could do? A few points on that, Judge Williams. First of all, it's disputed the degree to which supervision was required, and the answers changed at different times. So, for example, when Alvarado's mother was questioned by the agency investigator in 2005, she didn't make any statements along the lines of, he's not really working here. She said he's working here, but he's being paid room and board, so we didn't think that we needed to report it. Now, later on, she offered a somewhat different explanation of it. But as the ALJ explained, this explanation was not fully credible, because if he was as incompetent or as inept as they claimed, it was unlikely a flower store, the lifeblood of its business, is getting flowers and then getting them to the customers. Why would they entrust Eric with this mission-critical task if he was completely unable to perform it? So the ALJ did consider the alternate explanations, but found it not credible, because in the end, she's still trying to run a business, and if she just wanted to watch over him, she could have had him sit in the store. Why would she allow him to deliver flowers? Why would she allow him to pick up flowers if he really was unable to successfully do those tasks? I'd also like to point out that at the hearing, Eric Alvarado himself testified that about 50% of the... There has been some intimations about that. I believe there was an argument about... I know there were intimations or an argument. I asked concretely whether there was a focused argument about that possibility. I don't believe so, but I don't know for sure, because this... There's no such argument in the brief, but I just wondered whether it had come up. Because that's a possible characterization of that job. It is a possible characterization, but again, it's someone who, by his own admission, is being sent out on deliveries alone 50% of the time. We didn't... There was a small amount of vocational expert testimony of what constitutes sheltered work, but Dale Jay here thought that it appeared that Alvarado and his mother and his friend were all trying to downplay later on the significance of his work, given that that work activity was ultimately cited as evidence that he wasn't disabled. There's a reference here to his delivering flowers from his mother's store. Does that mean he drove the flowers somewhere to deliver? My understanding is that he picked up flowers on a regular basis, and then he at least made deliveries to a gas station on Friday nights, as well as some other deliveries. So maybe just one, because maybe just one address that he would go to. He wasn't driving all over the place. I don't get the sense that he was being sent to far away new places all the time, but I think it's also important to remember that the nature of the jobs that the ALJ asked about involved no written instructions whatsoever. It's all things that can be learned by oral commands. So difficulties with driving directions and the like, that's something that would be excluded by the RFC finding, especially at this time before the ubiquitous Google Maps or the alternatives probably would have involved reading directions and processing information on a map. The jobs we're talking about here, in this case, can be learned by short demonstration only, and the ALJ further specified that they had to be explained orally. It couldn't involve any reading of written instructions. One thing that struck me as odd, I've never seen this before, when the vocational expert listed the number of jobs in the three categories he thought Alvarado was competent to participate in, the numbers are estimated to the last digit. I've never seen that before. Where on earth would he get a number of such precision about jobs? There are a variety of different sources of job information. Some of them are publicly available, the ones noticed in Section 1566 of the regulations. There are also some private sources of job information available. I believe one's called the OEQ, or Occupational Employment Quarterly. There's another one called the SkillTran. But would they go to the last digit? It seems so strange. He's talking about jobs with this rapid turnover and stores opening, closing, this and that. It's hard to believe that a number of such precision could actually be accurate, or more than a guess. They didn't get into the methodology or the source of the job numbers. Well, they never do. For some reason, the applicant's lawyers never question them. I think it's probably, if you look at the purpose of, as expressed both in the HACT and in Section 1566 of the regulations, when you're talking about a significant number of jobs, basically it's in contrast to jobs that are isolated, available only in a few locations. So you're not going to disallow a disability claim in Georgia on the basis that someone could do some cannery jobs in Alaska. Well, that's a strange thing to say. And that's another peculiarity of the vocational expert testimony. They're supposed to give the number of jobs in the local area, the region, and the nation as a whole. And if there are a lot of jobs in the nation as a whole,  the statute refers to the nation as a whole. And oh, by the way, just so you know, the number of cannery jobs in Alaska, I can give you to the last digit. It's zero. There are no fish canneries in Alaska. Not a single one. I'm aging. When I was in college, that was the thing to do. Yes. $10,000 for the summer. Alaska was reasonably closed. But getting back to the question about... Sorry, I lost my train of thought. So the regulations say you can show a significant number of jobs in the nation either by showing a significant number of jobs in the local area or a significant number of jobs in the national economy. Sometimes, depending on the state, sometimes vocational experts will use local and regional area interchangeably. I would prefer it if they always offer the national jobs. But I think my bottom line point here is the jobs of house cleaner, kitchen helper, and auto washer, they come and tell us that these are not... I mean, it's clear there are plentiful numbers of these jobs. It's just the question whether these numbers have any significance or are just guesses. But I think you had asked why claimants' attorneys don't challenge these more at hearings. I think when you're dealing with jobs like these, I think that it's probably a strategic sense that I'm not going to get a lot of mileage by trying to argue that there aren't a significant number of kitchen helper jobs in America. Anyone who goes to a restaurant knows every restaurant has kitchen helpers. You multiply it out. If there are no further questions, I see that my time is expired. Okay. Well, thank you very much, Mr. Truitt. Ms. Hanson, do you have anything further? First of all, I'd like to say in terms of his mowing the yards, his brother Eric will tell you he broke a lot of lawnmowers and he did a lot of damage when he mowed the yards. But like a lot of things, they wanted him to do it. And this is actually the story of a mother who at age three had him, a devoted mother had him at age three, tested, made sure that his high school was done right. What is his IQ? His IQ varies, and the thing with a learning disabled, and there's different statements, is he has a... IQs don't usually vary very much. Well, what varies on it is some areas are like in the 90s and some areas are low, and that is an indication of a learning disability, that you don't have a consistency. There's no consistency. Yeah, but what is the overall IQ? I have it. I don't have it right with me right now. Well, one of the verbal IQ of 89, performance IQ of 73, full skill 79 at one time. This is the WAIS-3 test. I'm not quite sure when that was administered. I think that was by Del Fumi, Dr. Del Fumi. What I was looking for was the indication that he has slow mentation and that the neuropsychological report says that there is a dysfunction in his brain between his ability to connect his thoughts with his action, and that's the slow mentation. And that is what would have to be corrected to get him to work. And he did not deliver flowers to anybody but the places, the gas station, and then picking them up. His mom was always with him, and sometimes other people were with him. Why I did not argue on the cases is I had asked both VEs what happens if he needs accommodation, and they said if he needs accommodation, there are no jobs. And my argument is there is really no jobs unless you have a mother helping you. Okay, well, thank you. Your time has expired, Ms. Hanson. So we thank you both, counsel, and we will stand in recess.